FILED
2009 Jan-21  PM 04:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHARLES J. MOLLICA, et al.,

     PLAINTIFFS,

v.                              CASE NO. CV-07-J-1753-S

CONSECO INSURANCE COMPANY,
et al.,

     DEFENDANTS.

_____

CONSECO INSURANCE COMPANY,

     COUNTERCLAIM PLAINTIFF,

v.

CHARLES MOLLICA, PATTI M. MOLLICA,
JENNIFER TURK and RICHARD QUARLES,

     COUNTERCLAIM DEFENDANTS.

## <u>MEMORANDUM OPINION</u>

Pending before the court is defendant/counterclaim plaintiff Conseco Insurance

Company, Inc. ("Conseco"), and defendant Performance Matters Associates, Inc.'s

("PMA") motion for summary judgment (doc. 55) and brief and evidence in support

of said motion (docs. 56-58), to which the plaintiffs/counterclaim defendants filed a

response and evidence in support of their response (docs. 61-64, 70).  The defendants

thereafter filed a reply (doc. 69).  Having considered said pleadings, briefs and evidentiary submissions, the court finds as follows:

The material facts of this case are not in dispute.  The plaintiffs' claims arise out of their attempts to sell a workplace universal life insurance product for PMA, a wholly owned subsidiary and marketing arm of Conseco, Inc.  Weaver depo. at 36-37;[1] Ryan depo. at 76.[2]  The plaintiffs assert that they were misinformed by defendants regarding the underwriting requirements for this policy, and therefore failed to make the money they were assured could be made.  They brought claims for promissory fraud (Count I), fraudulent misrepresentation (Count II), fraudulent suppression (Count III), negligence (Count IV), wantonness (Count V), and quantum meruit (Count VI).  Defendant Conseco filed counterclaims against plaintiffs Charles Mollica, Patti Mollica, Jennifer Turk and Richard Quarles for breach of contract.

Each of the plaintiffs worked as an agent for PMA and Conseco on an independent contractor basis.  C. Mollica depo. at 64, 171, 272; P. Mollica depo. at 68; J. Mollica depo. at 147; Turk depo. at 102; Mathis depo. at 66-67.  Each of the plaintiffs[3] signed a "Sales Representative Agreement" with defendant Conseco

[1]Chris Weaver is president of PMA.  Weaver depo. at 8.

[2]Chris Ryan is Senior Director of Sales for Conseco.  Ryan depo. at 65.

[3]The majority of the plaintiffs are related.  Charles Mollica got his brother, Joseph Mollica, appointed as an agent for PMA.  C. Mollica depo. at 170-171.  He hired his brother-in-law,

between April 2004 and September 2005.  C. Mollica depo. at 55-61, 268; P. Mollica depo. at 51, 59, 61, 65, 115; Quarles depo. at 134-147; Smith depo. at 42-44, 62, 132-133; J. Mollica depo. at 44-45, 144; Turk depo. at 35, 37-45, 98.  *See also* defendant exhibits 12-19.  Upon promotion, Charles Mollica again signed a contract.  C. Mollica depo. at 125-126.  He read each of the contracts before he signed it.  C. Mollica depo. at 124-126, 268.

The plaintiffs received commissions and advances against future commissions.  C. Mollica depo. at 64-66, 272; P. Mollica depo. at 117.  They could also receive "special advances" which were more like loans, which were also deducted as commissions were earned.  C. Mollica depo. at 302-303.

When Charles Mollica was first appointed as an agent in April 2004, the focus of the products to be sold were a supplemental health policy and a Trustmark life insurance policy.  C. Mollica depo. at 126-127, 172, 185.  Charles Mollica asserted he heard from customers they had problems with Conseco, so it was important to him that he was selling Trustmark life insurance product.  C. Mollica depo. at 172-173.  Charles Mollica also asserted there were problems with Conseco issuing policies.  C. Mollica depo. at 174-175.  He also knew that the sale of the Trustmark products was

---

plaintiff Richard Quarles; plaintiff Jennifer Turk, his sister plaintiff Mary Kay Mathis (Minor); his wife, plaintiff Patti Mollica, and others to work for PMA.  C. Mollica depo. at 181-183.

temporary, and only until Conseco developed its own life insurance policy modeled on Trustmark's.  C. Mollica depo. at 175-176, 188-189.

In approximately June 2005 a meeting was held in Birmingham, which the plaintiffs attended, where the new Conseco life insurance policy ("Worksite UL") was introduced.[4]  C. Mollica depo. at 208, 210-211; P. Mollica depo. at 76-78; Mathis depo. at 113.  This Worksite UL policy had already been introduced in other markets.  Weaver depo. at 87-88; Tuckerman deposition at 94;[5] Ryan depo, at 165-166.  The plaintiffs were told that the Conseco life insurance policy would mirror the Trustmark policy.  C. Mollica depo. at 372; Mathis depo. at 119; Quarles depo. at 108.  Because the plaintiffs believed this would be a modified guaranteed issue policy, they questioned why the  application asked for the height and weight of the applicant, which differed from the Trustmark application.  C. Mollica depo. at 217-218; Mathis depo. at 119-120.  According to the plaintiffs, Chris Ryan checked into this and reported back to the plaintiffs that "the consensus was Conseco wanted us to capture that information, but that it would specifically only be used if someone was in the simplified issue process, meaning that – that if – as long as they answered no to the

---

[4]To the best of Joseph Mollica's memory, he did not attend this meeting.  J. Mollica depo. at 62.  However, he thought the Conseco Worksite UL policy would be the same as the Trustmark policy from conversations with Charles Mollica.  J. Mollica depo. at 213.

[5]Tom Tuckerman holds the title of Senior Vice-President of Sales for PMA, but is an independent contractor.  Tuckerman depo. at 49-50.

4

other questions and it was not a simplified issue application, that taking light – taking height and weight into consideration would not be an issue.  It would not matter if someone was overweight, as long as the questions were no on the applications.  So we were fine..."  C. Mollica depo. at 219; P. Mollica depo. at 84-85, 125-126, 138, 242; Mathis depo. at 121-123.

Ryan has no specific memory of any questions regarding height and weight on the application, but does not deny that he specifically inquired about this during the meeting.  Ryan depo. at 199, 201-202, 223.  At that time, he did not think height and weight would be used to determine insurability of an applicant.  Ryan depo. at 200, 203-205.  According to Richard Quarles, when this issue came up, "it stopped the meeting."  Quarles depo. at 107.  The plaintiffs were told not to worry about the height and weight because it was only there in case they needed it later.  Quarles depo. at 110-111.  Quarles asserts that the agents at this meeting were told height and weight would be considered only if the policy was to issue as simplified rather than modified guaranteed issue.  Quarles depo. at 127.  In contrast, Turk states that no one ever told her that height and weight would not be considered.  Turk depo. at 73.

According to PMA representatives, the agents at the rollout meeting were told the differences between the Trustmark and Conseco products, and the height and weight requirements was one of them.  Weaver depo. at 99, 175; Foster depo. at 97-98.

5

The underwriting and application were also different.  Weaver depo. at 100; Foster depo. at 98.  Although PMA knew prior to the rollout that height and weight would be used in underwriting the policy, this was not documented until the agent guide was finalized later that year.  Weaver depo. at 174-176, 179; J. Mollica deposition at 220.  The policy in question was not guaranteed issue, but rather simplified issue.  Weaver depo. at 178.

According to Mike Foster, a state manager for PMA, the agents were told during the June 2005 meeting that height and weight would be determinative of the insurability of a person.  Foster depo. at 99.  He does not recall anyone asking about Medical Information Bureau ("MIB") checks.  Foster depo. at 105.  He does not recall anyone ever representing that the Conseco product would mirror that of Trustmark.  Foster depo. at 107-108.  Rather, they are similar.  Foster depo. at 108.

When sales of the Worksite life insurance policy began, the plaintiffs had very successful enrollments.  C. Mollica depo. at 194-195, 198; Mathis depo. at 131.  However, the plaintiffs were not getting paid.  C. Mollica depo. at 199-200.  The laptop computer system defendants had set up for enrollments did not work properly either.  C. Mollica depo. at 199, 222-223; Mathis depo. at 118.  The policies did not issue as they should have.  Turk depo. at 71-72.  Charles Mollica reported the problems and Foster stated that the "bugs" would be worked out.  C. Mollica depo. at

199.  Upon checking, Charles Mollica learned the policies they had written were all pending and that was why no one had been paid.  C. Mollica depo. at 200-201; P. Mollica depo. at 126-128; Mathis depo. at 131-132; Quarles depo. at 116-117.  That was when Charles Mollica learned the defendant was running a MIB check on every application.  C. Mollica depo. at 201.  This was done with every application for the Trustmark policy as well.  Tuckerman depo. at 133.  Tuckerman states agents were told and should have known that an MIB would be run on every policy.  Tuckerman depo. at 134. According to Foster the use of random personal history interviews was also discussed at the rollout meeting.  Foster depo. at 134-135.

Thus, the plaintiffs learned height and weight would be considered and a personal interview would be required on all applicants. Mathis depo. at 132-133; Turk depo. at 73.  The final decision on using height and weight was made by Conseco in August 2005.  Tuckerman depo. at 135.  *See also* defendant exhibits 24 and 25.  Ryan learned in August 2005 from the underwriting department that height and weight would be considered for modified guaranteed issue.[6]  Ryan depo. at 212.  He learned this from a field bulletin dated August 22, 2005.  Ryan depo. at 213-214.  Charles Mollica was at the meeting where this was announced in August 2005.  Tuckerman

---

[6]Modified guaranteed issue meant that as long as an applicant met certain criteria, the policy would issue at a specified coverage level.  Ryan depo. at 210.

depo. at 136-138.  According to the plaintiffs, this undermined their representations to the people they were enrolling that they would have a policy in two weeks.  C. Mollica depo. at 203-204; P. Mollica depo. at 132-133.  Charles agreed that lots of companies have MIB checks, but stated it was unheard of to do so for group policies. C. Mollica depo. at 206.  Additionally, the delay in approvals caused payroll deductions for the applicant's employers to not match with the bills Conseco was sending.  C. Mollica depo. at 231-233; P. Mollica depo. at 133; 150-151.  This caused several accounts to not let the plaintiffs return because the payroll billing was so confused.  C. Mollica depo. at 233.

Foster agrees that there were billing problems with the life insurance policy and stated he believed Conseco was not well prepared to administer the product.  Foster depo. at 152.  He does not know why the issuing of the policies was so slow, but guesses that it had to do with the underwriting.  Foster depo. at 152, 154.  Foster was not happy with the Worksite UL policy and found the underwriting process was different from what he had anticipated because of the belief that the product would be similar to that of Trustmark.  Foster depo. at 153-155.  Foster told Charles Mollica to stop selling the Worksite UL product and refocus his energies on a different product because of all the issues with it.  Foster depo. at 155-157.

Weaver heard of problems with the Worksite UL product after its rollout, including problems with the computer program and agents having questions about height and weight, and underwriting. Weaver depo. at 103. An agent guide for the product had not yet been finalized at the time of the Birmingham meeting. Weaver depo. at 105; Tuckerman depo. at 21, 101. The agent guide was published in August 2005. Tuckerman depo., at 101; Ryan depo. at 235-236. That guide states unequivocally that coverage is only available within the height and weight guidelines. Defendant exhibit 26, at PMA001156.

PMA had issues with Conseco's application of the height and weight tables but knew six months before the rollout that these tables would be applied for underwriting. Weaver depo. at 107-109. Six months to a year prior to its introduction, Weaver was aware that the Conseco product would not mirror Trustmark's universal life product. Weaver depo. at 110. By early 2005, Weaver informed agents that the Worksite UL policy would not mirror Trustmark's. Weaver depo. at 111.

According to Tuckerman, the goal was to make the Conseco product as close as possible to the Trustmark product. Tuckerman depo. at 114. However, agents were told they needed to collect the height and weight information, which the Trustmark product did not seek for modified guarantee issue policies. Tuckerman depo. at 115-119. Early on in the rollout, PMA was campaigning for Conseco to not use height and

weight, but Conseco said gather the information and they would continue to discuss its use. Tuckerman depo. at 119-120, 122-123, 126-127. This was discussed at every one of the rollout meetings. Tuckerman depo. at 120-121.

A second meeting, to reintroduce the Worksite UL policy, was held in October 2005. J. Mollica depo. at 69. The plaintiffs learned that height and weight would matter, which was different from what they were told at the June 2005 meeting. C. Mollica depo. at 222. Charles opined that someone had already made that decision and it had been miscommunicated to the plaintiffs. C. Mollica depo. at 224. According to plaintiffs, they received correspondence from people that were being turned down for coverage because of their height and weight. C. Mollica depo. at 232; P. Mollica depo. at 147; J. Mollica depo. at 83.

The manual the plaintiffs were provided when Conseco introduced the life insurance policy states that all applications were subject to underwriting, and further specified that all applicants were subject to height and weight guidelines. C. Mollica depo. at 376-377. Charles Mollica disputes that he ever received the manual, but then agrees that maybe he did. C. Mollica depo. at 378-379. Patti Mollica remembers receiving a binder at the June 2005 meeting. P. Mollica depo. at 90; 183.

Because of all the problems, toward the end of 2005 Mike Foster told the plaintiffs to stop selling the Conseco life insurance policy. C. Mollica depo. at 239,

10

242; Foster depo. at 112.  He said that he did not want to sell the product until Conseco fixed their administrative problems.  C. Mollica depo. at 240; Mathis depo. at 143.

Ryan stated that there were issues with the policy after its rollout, including delays in issuing.  Ryan depo. at 252.  Because the policyholder interview process was new, there were complaints about it.  Ryan depo. at 252.  However, the policies were issuing within about a ten day time frame.  Ryan depo. at 254.  Every application was submitted to MIB.  Ryan depo. at 255.  He does not remember this being referenced in the rollout meetings.  Ryan depo. at 255-256.

At the end of 2005, Conseco announced that the problems were fixed and they were going to start selling the life insurance policy again.  C. Mollica depo. at 244; Mathis depo. at 112.  The plaintiffs were told that the underwriting and MIBs would remain in place, but the process had been tweaked to make it faster.  C. Mollica depo. at 245.  The plaintiffs did another group enrollment, which Charles Mollica termed a "disaster," because the billing/payroll problems had not been fixed.  C. Mollica depo. at 245-247; P. Mollica depo. at 143; Mathis depo. at 156.  Some of the plaintiffs assert that they again were told around this time that height and weight would not matter.  P. Mollica depo. at 100; Mathis depo. at 147-148.

Patti Mollica states Conseco's dishonesty caused her not to be trusted by the people to whom she was selling. P. Mollica depo. at 139. The billing issues were so problematic that some of the entities to whom the plaintiffs had previously sold stopped them from coming back. P. Mollica depo. at 155-158; Mathis depo. at 143-144. However, Foster states they continue to do business with each of the groups available to Charles Mollica. Foster depo. at 170-171. Mathis could not specify any number of policies declined due to height and weight, or the number declined in general.[7] Mathis depo. at 136. Similarly Quarles testified that all of the pending and declined applications snowballed and "long story short, it all got cancelled." Quarles depo. at 123. However, he has no idea how many applications were ultimately rejected by Conseco. Quarles depo. at 126. He believes he is entitled to renewal commissions but cannot put this into a dollar amount "since so many applications were declined." Quarles depo. at 209.

Plaintiff Charles Mollica states that PMA "inaccurately misrepresented the opportunity they were giving ("sic") with this company." C. Mollica depo. at 112. He referred to there being a "colossal of incompetence with regard to PMA's managing of or involvement in the managing of the account base in which they represented to

---

[7]The sole evidence before the court regarding the number of policies issued and/or declined is that there were 686 Worksite UL contracts issued in Alabama, 47 applications were declined, and of those declined applications, 12 were so declined due to height and weight. Defendants exhibit 9, at 6-7 (interrogatory no. 7).

me early on." C. Mollica depo. at 112. Furthermore, "it was PMA's actions that put

me into the position with regards to life insurance and their new life insurance product

that they mandated that I sell, and that my team of agents sell, was not ready to be

marketed, it was – they were not prepared."[8] C. Mollica depo. at 113. As to Conseco,

plaintiff Mollica asserted his claims were based on "the consistency in mismanaging

the accounts, the account base, the administration of the payroll within these payroll

groups, the mismanagement of the monies that would come into Conseco ... Lack of

paying claims, the absolute nightmare to get them to pay any claims, and then again,

just the total lack of regard for servicing of the clients that I went out here and sold

and promised the services to.... then came Conseco Insurance Company, which was

the life insurance, which ultimately shut our whole business down. And it was just

total incompetence with regard to the administration of that policy, and ... there were

lies involved with regard to what they told us in an effort to get us to go out and – and

market this product." C. Mollica depo. at 115-117. According to Charles Mollica, the

problems with the life insurance policy stemmed from Conseco not being prepared for

the volume of business the plaintiffs produced and because the defendants focused on

---

[8]No evidence supports the assertion that PMA "mandated" plaintiffs sell the Worksite UL
policy. Evidence does support that the plaintiffs received much higher commissions for life
insurance policy sales than for supplemental health policy sales. *See e.g.*, Quarles depo. at 102-103.

the implementation of the policy rather than what was happening to the people who were getting sold the policies.  C. Mollica depo. at 234.

Mathis said that trying to sell the life insurance was a disaster.  Mathis depo. at 158.  She thought Conseco was not holding up its side of the bargain because of the issues with billing and getting the policies issued.  Mathis depo. at 158-161.  She thinks the plaintiffs were misled because they thought they would be able to have a family business together and secure business, and Conseco did not hold up its end of the bargain.  Mathis depo. at 173-174.  She claims PMA should have been more supportive and should have tried to open more cases.  Mathis depo. at 292.

Patti Mollica stated that "... I felt like I was told wrongly about the policy.  Then the people that I spoke to perceived it wrongly, again.  Just the whole policy itself was not rolled out properly.  We weren't really told the truth about what was going on with the policy.  So we couldn't tell the people we were showing the policy to the truth." P. Mollica depo. at 124-125.  However, Patti Mollica admits that at some point she received documents reflecting that "no" answers to the relevant questions did not guarantee coverage and that all applications were subject to underwriting.  P. Mollica depo. at 239-241.

Richard Quarles contends that Conseco and PMA gave them "a life insurance product to sell with false underwriting questions."  Quarles depo. at 59.  Quarles stated

that the life insurance product was supposed to issue if an applicant "answered a couple of questions no.  But on the application, they asked for the [applicant's] height and weight.  And that question should not have been used to determine whether a person was insurable..."  Quarles depo. at 61-62.  Quarles focused on sales of the life insurance policy because it paid a bigger commission than other products.  Quarles depo. at 102-103.

Jaime Newman Smith asserts that they were writing life insurance policies on the assumption that the underwriting process would be simple, but the background medical checks caused a delay in the policies being issued.  Smith depo. at 59-60.  She based her understanding of the underwriting process on an October 2005 meeting where she was told that the Conseco policy was modeled after the Trustmark policy.  Smith depo. at 61.  The slow underwriting process caused individuals to lose faith and look elsewhere for life insurance.  Smith depo. at 65.  She does not know if anyone at Conseco or PMA ever told her anything that was false, but rather just knows that her impression of how the coverage would work was not accurate.  Smith depo. at 92-93.  Her biggest complaint was how slow underwriting was, but she also thought policies should have issued that did not.  Smith depo. at 122.  She does not know how many applications were turned down.  Smith depo. at 122-123.

Jennifer Turk avers solely that they were "not told exactly what was going on with them, to be honest. All the issues that were result (sic) with them." Turk depo. 91. She further claims she was terminated and did not know why and was turned over to a collection agency. Turk depo. at 91-92.

Joseph Mollica claims that "they misrepresented [] to us how they would issue these policies. We were told that if a client answered no to three ... questions, that they would issue those policies, and they did not do that." J. Mollica depo. at 78. He received this information from his brother, Charles Mollica. J. Mollica depo. at 81. Additionally, he complains that it took too long to issue the policies so that by the time they were put on payroll, they were already behind and there was no way to make up the difference in the premium payment, so the policies were cancelled, creating debt for the plaintiffs. J. Mollica depo. at 78-79, 87, 106-107. He further asserts policies did not issue because either underwriting information such as height and weight was not provided or the telephone interview was not completed. J. Mollica depo. at 141.

Charles Mollica agrees that he could have quit and gone elsewhere. C. Mollica depo. at 220. He further agrees that the defendants had the right to change the manner in which a policy was underwritten. C. Mollica depo. at 225. The individuals he spoke with at Conseco were trying their best to correct the problems, but it was outside the realm of their abilities. C. Mollica depo. at 236. By the end of 2005 and

16

beginning of 2006, the agents Charles Mollica had recruited began to find other jobs because they were not making any money.  C. Mollica depo. at 248-249.

Pursuant to the contract entered between each of the plaintiffs and the defendants, the plaintiffs agreed that the defendants had the right to change any guideline, rule, policy, instruction, or directive relating to market conduct, underwriting rules or guidelines.  C. Mollica depo. at 270-272; P. Mollica depo. at 162-163; Mathis depo. at 208-210.

After the plaintiffs' contracts were terminated, Conseco demanded payment for debt owed to the company, which Conseco had a right to do pursuant to the contract.  C. Mollica depo. at 273.  The contract allowed either party to terminate it without cause with thirty days notice.  C. Mollica depo. at 276; P. Mollica depo. at 164.  Additionally, it could be terminated for cause for a variety of reasons, including the failure to pay an indebtedness to the company upon demand for the same.  C. Mollica depo. at 276; Mathis depo. at 215.  Lastly, the contract included the statement that the agreement was the entire agreement between the parties and any representations otherwise, not included in the agreement, would be of no force and effect.  C. Mollica depo. at 277-278; Mathis depo. at 215-216.

Joseph Mollica received a letter from PMA stating that his contract with Conseco would be terminated effective December 31, 2006, per the request of PMA.

17

C. Mollica depo. at 304-305.  This was due to Joseph getting a different job.  C. Mollica depo. at 305.  Charles Mollica received a similar letter dated January 16, 2007, because he had taken a different job.  C. Mollica depo. at 306-307.  The letter states that upon such termination, any outstanding debt would be immediately due and payable.  C. Mollica depo. at 307-308.  However, Charles thought his policy renewal commissions would be applied to the outstanding debt.  C. Mollica depo. at 308-309. Patti believed the same.  P. Mollica depo. at 166-167, 224, 253.

According to Charles Mollica, Conseco has no right to collect the debt because it was their underwriting practices and incompetency which caused the debt.  C. Mollica depo. at 355-356.   However, he does not know how much of the debt is attributable to the sale of health insurance policies as opposed to the life insurance policies.  C. Mollica depo. at 395-397.

Quarles still receives renewal commissions from Conseco for his sales of the Trustmart policy.  Quarles depo. at 77.  He received notices from Conseco upon his termination that he owned unpaid balances to Conseco, but he did not pay these amounts.  Quarles depo. at 175-178.  He disputes he owes these amounts "[b]ecause of the life problem, the problem we have with the life insurance apps."  Quarles depo. at 219.  Joseph Mollica also received commissions from Conseco and Trustmark.  J. Mollica depo.at 43.

By declaration, plaintiffs Charles Mollica, Patti Mollica, Richard Quarles, Mary-Kay Mathis-Minor, and Jamie Newman Smith each assert they did not receive or review any of the August 2005 materials unequivocally stating that height and weight guidelines would apply to the issuance of the Worksite UL policies.  *See* plaintiffs' exhibits 1-5.

## II.  Standards for Evaluating a Summary Judgment Motion

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986); *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F .3d 1139, 1143 (11th Cir.2008). The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the non-movant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

19

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. See Rule 56(e); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir.2005).

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case .... A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir.2000)(quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995)).

### III. Legal Analysis

In the facts before this court, the plaintiffs assert that "this case is about the incompetence of an insurance company, the lies told to cover up that incompetence, and the far reaching and detrimental effect those lies had on a budding family business." Plaintiffs' memorandum brief (doc. 61), at 1. However, the plaintiffs did

20

not sue the defendants for incompetence.  They sued the defendants for promissory fraud (Count I) for (a) false representations that each plaintiff would receive commissions; (b) false representations that the defendants would apply guaranteed issue underwriting standards to the Worksite UL policies; (c) false representations that height and weight would not be considered for the guaranteed issue policy; (d) false representations that the defendants would fix the problems with the policies; and (e) false representations that plaintiffs would earn more money than they did.  The plaintiffs also brought claims for fraudulent misrepresentation (Count II), for misrepresentations of material fact; fraudulent suppression (Count III) for failing to disclose to the plaintiffs that it would apply "strict underwriting guidelines which would result in the rejection of most applications;" negligence (Count IV) for the defendants not operating their business in a reasonable and prudent way;  wantonness (Count V) based on the allegation that the defendants' actions were intentional and with reckless disregard to their consequences; and quantum meruit (Count VI) based on the assertion that the defendants did not pay the plaintiffs a reasonable value for their services.

The plaintiffs do not assert that they were fraudulently induced to enter their sales representative agreements, but rather that the Worksite UL policy was not underwritten in the manner they expected and were informed that it would be.  The

plaintiffs make no argument that they are not bound by the contracts they entered. With these considerations in mind, the court considers each of the plaintiffs' claims.[9]

## A. Abandoned Claims

In their response to the defendants' motion for summary judgment, the plaintiffs fail to offer any evidence or argument in opposition to defendants' motion for summary judgment with regard to plaintiffs' claims for promissory fraud (Count I); wantonness (Count V), and quantum meruit (Count VI).[10] As such, the court finds the plaintiffs have abandoned these claims against defendants. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.,* 325 F.3d 1274, 1284 (11th Cir.2003); *see also Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir.2001). Defendants' motion for summary judgment shall therefore be granted on these counts of the plaintiffs' amended complaint.

---

[9]The defendants argue that all of the plaintiffs' claims are barred by the relevant statutes of limitations. The court does not reach this issue, but rather assumes for purposes of this opinion, that the claims are not so barred.

[10]The plaintiffs fail to mention their assertions for promissory fraud that (a) each plaintiff would receive commissions; and (e) false representations that plaintiffs would earn more money than they did. Finding that these claims have been abandoned, the court shall grant the defendants' motion for summary judgment as to these claims. The plaintiffs have rolled their discussions of the remaining three statements listed under their claim for promissory fraud into two statements, and chosen to discuss these statements as claims for misrepresentation. Therefore, the court shall grant the defendants' motion as to Count I of the amended complaint, but consider the two remaining statements in regard to Count II of the amended complaint, namely misrepresentation.

Additionally, the court finds that the plaintiffs wholly failed to put forth any evidence concerning their claims for negligence.  The plaintiffs state solely

> Without belaboring the point, Defendants' motion for summary judgment on Plaintiffs' negligence claims are based on the same evidence and argument as that presented above.  For those reasons and others, Defendants' motion for summary judgment on Plaintiffs' negligence claims are (sic) due to be denied as well.

Plaintiffs' memorandum brief, at 32.

Failure to brief and argue an issue is grounds for finding that the issue has been abandoned. *Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1030 (11th Cir.1982).  By merely asserting that "[f]or those reasons and others, Defendants' motion for summary judgment on plaintiffs' negligence claims are (sic) due to be denied," the plaintiffs leave this court to guess at what arguments or evidence may support the plaintiffs' claim of negligence.  The district court has no burden to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*,  43 F.3d 587, 599 (11th Cir.1995); citing  *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th  Cir.1994) (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th  Cir.1986)), *cert.*

23

*denied*, --- U.S. ----, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994)).  The court shall therefore

grant the defendants' motion on Count IV of the amended complaint as well.

## B.  Misrepresentation

In response to the defendants' motion for summary judgment, the plaintiffs

assert that the evidence demonstrates that defendants misrepresented (1) the

underwriting guidelines of the Worksite UL policy and (2) the status of the policy

when it was reintroduced.  Plaintiffs' memorandum brief, at 23.

To survive a motion for summary on a claim for fraudulent misrepresentation,

the plaintiffs must establish the existence of a genuine issue of material fact as to four

elements: "(1) a false representation, (2) concerning a material existing fact, (3)

[reasonably] relied upon by the plaintiff[s], (4) who [were] damaged as a proximate

result." *Moore v. Prudential Residential Services Ltd. Partnership,* 849 So.2d 914,

923 (Ala.2002); citing *Fisher v. Comer Plantation, Inc.*, 772 So.2d 455, 463

(Ala.2000) (*quoting Baker v. Bennett*, 603 So.2d 928, 935 (Ala.1992)). *See also*

*Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala.1997).

The plaintiffs assert that the underwriting standards were misrepresented to

them because the plaintiffs were told that the Worksite UL policy would have the same

modified guarantee issue underwriting standards as the Trustmark policy.  Plaintiffs'

memorandum brief, at 23.  However, the testimony plaintiffs cite for this proposition

24

does not actually state this.  Rather, Charles Mollica testified that he was told the Coseco policy "was the exact mirror image of the Trustmark policy.  That they designed it and modeled it identically with one single exception being ... something to do with the internal mortality rates and the cash value accumulations..."  C. Mollica depo. at 372.  Similarly, Chris Weaver testified that he did made respresentations that the Conseco policy would mirror the Trustmark policy, but when he learned this was not the case during the first quarter of 2005, he began to inform agents that the Conseco product would not mirror the Trustmark policy.  Weaver depo. at 110-111.

Having misconstrued the actually testimony cited, the plaintiffs next state that "[t]o the Plaintiffs, this meant ..." Plaintiffs' memorandum brief at 23.  Unfortunately, plaintiffs' interpretation of defendants' statements is not a relevant consideration.  Rather, the plaintiffs must point to a specific statement that was not true, that was material, that was reasonably relied on by the plaintiffs, and which caused the plaintiffs' harm.   Specifically, the plaintiffs make much ado over various representations concerning the defendants' use of height and weight in determining the insurability of applicants.  However, the plaintiffs do not allege that, but for the height and weight standards applied in underwriting of applications, they would have been successful. *See Fisher v. Comer Plantation, Inc.,* 772 So.2d 455, 466 (Ala.2000) ("When deciding whether the plaintiff relied on a misrepresentation, the fact-finder

must consider whether the plaintiff would have chosen a different course but for the suppression of a material fact.").  Rather, the plaintiffs allege that but for Conseco being extremely slow in processing the applications, they would have been successful. While both arguments are based on sheer speculation, the court notes a significant difference between the two.  To survive summary judgment, the plaintiffs must establish that the defendants told them something that was not true and on which they reasonably relied.  Conseco's alleged incompetence in processing applications does not fall within this category.

Additionally, the plaintiffs admit that the guidelines for underwriting were already in place when they were allegedly told height and weight would not matter. Plaintiffs' memorandum brief, at 25.  The plaintiffs assert that this is unimportant because they were told otherwise. *Id*.  Assuming solely for purposes of argument that plaintiffs were told height and weight would not be considered, that MIB checks would not be performed, and whatever else plaintiffs deem to have been untrue, the plaintiffs were not reasonable in their ongoing reliance on these statements in the face of numerous documents stating otherwise.  Even assuming those August 2005 documents did not exist, or were hidden from plaintiffs, the plaintiffs cannot avoid the language of the contracts they each signed.  Those contracts each state:

The Company reserves the right at any time to change any guideline, rule, policy, instruction or directive relating to, but not limited to, market conduct, underwriting rules or guidelines, mortality rates and interest crediting rates.

Defendants exhibit 12, ¶ 5;[11] defendants exhibit 13, ¶ 5 defendants exhibit 14, ¶ 5; defendants exhibit 15, ¶ 6; defendants exhibit 16, ¶ 6; defendants exhibit 17, ¶ 6; defendants exhibit 18, ¶ 6.  Given this language, the plaintiffs had no basis to reasonably rely on the representations in question when they each agreed, in writing and by contract, that the underwriting guidelines could change at any time.

The plaintiffs additionally assert that the defendants' representations that the problems they were experiencing had been fixed are actionable.  The court does not doubt plaintiffs' assertions that they relied on these statements to their detriment. However, the court finds such representations are not material facts.  Rather, such statements are nothing more than "puffery" on which the plaintiffs had no right to rely. "[S]tatements of opinion amounting to nothing more than 'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act...." *McGowan v. Chrysler Corp.*,  631 So.2d 842, 846 (Ala.,1993); *Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So.2d 256, 259 (Ala.1991).

---

[11]Charles, Patti and Joseph Mollica's agreements each contain further language that they will inform all sub-producers or employees of such rules.

Considering the statements allegedly made by the defendants in the light most favorable to the plaintiffs, the court concludes that a jury could not reasonably find that these representations were statements of material fact.[12]   Rather, these are statements of defendants' beliefs as to the functioning of their internal processes.  At the same time the plaintiffs claim they were informed the problems were fixed, the plaintiffs had access to the agent guide, published in August 2005, which unequivocally states that height and weight will be considered.  The fact that the plaintiffs did not procure copies of this manual alone makes their reliance on statements otherwise unreasonable.[13]

--------

[12]The Alabama Supreme Court faced a similar set of facts in *American Pioneer Life Ins. Co. v. Sherrard*,  477 So.2d 287, 291 (Ala.1985).  There, the court wrote:

> The Sherrards were entering a business venture for which they knew or should have known they were taking risks. These circumstances effectively undercut any assertion of reasonable reliance on any statements by Joachim contrary to the terms of the documents.

> The Sherrards argue in their brief that other statements by Joachim support their claim of fraud: that Smith's idea was the greatest thing Joachim had seen, that it was American Pioneer's number one priority, and that it would revolutionize the industry. These statements are mere puffery and will not support a claim of fraud. *Harrell v. Dodson*, 398 So.2d 272 (Ala.1981).

[13]Perhaps the unreasonableness of the plaintiffs in relying on the defendants' representations that "the problems were addressed" and "the issues were worked out" is best illustrated by plaintiffs' argument that these statements were "made by the Defendants in their attempt to keep a failing policy in mass production."  Plaintiffs' memorandum brief, at 26.  Logically, if the plaintiffs failed to sell policies, the defendants failed to make money.  Thus, the plaintiffs' argument that defendants wanted to "keep a failing policy in mass production" is absurd.

28

Having considered the foregoing, the court shall grant the defendants' motion for summary judgment on Count II of the plaintiffs' amended complaint.

## C.  *Suppression*

To establish a claim of fraudulent suppression, the plaintiffs must produce substantial evidence showing: (1) that the defendants had a duty to disclose an existing material fact; (2) that the defendants suppressed that existing material fact; (3) that the defendants had actual knowledge of the fact; (4) that the defendants' suppression of the fact induced the plaintiffs to act or to refrain from acting; and (5) that the plaintiffs suffered actual damage as a proximate result.  *University Federal Credit Union v. Grayson,* 878 So.2d 280, 289 (Ala.2003), *citing State Farm Fire & Cas. Co. v. Slade,* 747 So.2d 293, 323-24 (Ala.1999).  *See also Ex Parte Life Ins. Co. of Georgia*, 810 So.2d 744, 748 (Ala.2001).

The plaintiffs do not allege any specific fact put forth by the defendants on which they relied, but rather assert that the defendants generally owed a duty of full disclosure to the plaintiffs.  Plaintiffs' memorandum brief, at 29.  The plaintiffs assert that this duty arises from the covenant of good faith and fair dealing.  *Id*.  However, the plaintiffs fail to allege or produce any evidence of a single existing fact that the defendants suppressed.  Assuming the plaintiffs rely on the same statements for this claim as their claim for fraudulent misrepresentation, the plaintiffs' claim again fails.

29

At best, the plaintiffs' allegations and the evidence before this court demonstrate confusion by the defendants as to the specific underwriting standards which would apply to the Conseco UL policies.  This is not equivalent to the suppression of a material fact.  Even assuming that the defendants knew height and weight would be used in underwriting the policies in June 2005, the plaintiffs could not reasonably act on representations to the contrary because Conseco could change its underwriting guidelines at any time.  In other words, the plaintiffs can show no injury resulting from defendants' alleged suppression.

The plaintiffs have failed to show that, but for the defendants' suppression, they would not have attempted to sell the Worksite UL policy.   The plaintiffs have put forth no evidence that but for the alleged suppression they would have taken any actions different than those they took.  The plaintiffs also fail to assert any actions they took to stay updated on the changes being made to the processing of the policies in spite of the fact that they knew it was a new product for the defendants, knew there were issues in getting policies issued, and knew they were receiving contradictory information concerning the underwriting process.  Having considered the evidence, the court is of the opinion that the defendants are entitled to summary judgment in their favor on Count III of the plaintiffs' amended complaint.

## D.  Breach of Contract Counterclaim

Defendant/counter-plaintiff Conseco also seeks judgment in its favor and against counter-defendants Charles Mollica, Patti Mollica, Jennifer Turk and Richard Quarles on the counterclaims pending against them (doc. 55).  The counter-plaintiff asserts that

> Conseco has clear evidence of the amount of the Counterclaim Defendants' debts.  The Counterclaim Defendants admit the facts that make them liable to Conseco; they admit signing the contracts, they admit taking advances and other forms of compensation that made them indebted to Conseco, and they admit that they have not paid these sums to Conseco.  Liability and damages are undisputed.

Defendants' memorandum (doc. 56), at 48.  The counter-defendants assert Conseco is not entitled to recover on these claims because the contracts in question contain a statement that the "Company and representative desire to enter into this Agreement and work together for their mutual benefit..." Plaintiffs' memorandum brief, at 32-33. They assert that because of the alleged misrepresentations, they could not make a living, and further, because of the misrepresentations, the contracts cannot be enforced.  *Id.*, at 34-35.  Neither these allegations nor any evidence support a finding that the contracts in question should not be enforced.

Because the plaintiff/counter-defendants have admitted that the debts in question are due and owing pursuant to their individual contracts, the court is of the

opinion that the defendant/counter-plaintiff's motion for summary judgment on the counterclaims is due to be granted, the court finding no genuine issue of material fact and finding that the defendant/counter-plaintiff is entitled to judgment in its favor on the breach of contract claims as a matter of law.  In accordance with the undisputed evidence before the court, judgment shall be entered in favor of the defendant/counter-plaintiff and against counter-defendants Charles Mollica in the amount of $11,443.42; against counter-defendant Patti M. Mollica in the amount of $3,051.63; against counter-defendant Jennifer Turk in the amount of $1,692.33; and against counter-defendant Richard Quarles in the amount of $5,150.28.  *See* Affidavit of Christy Wilson, ¶¶ 4-7, submitted as defendants exhibit 23.

### III.  Conclusion

The court having considered the foregoing, the court is of the opinion the defendants' motion for summary judgment is due to be granted on all counts of the plaintiffs' amended complaint.  By separate Order, the court shall **GRANT** said motion, finding no genuine issues of material fact and that the defendants are entitled to judgment in their favor as a matter of law.

The court is further of the opinion that defendant/counter-claim plaintiff Conseco's motion for summary judgment on its counterclaims against the plaintiffs/counterdefendants on the breach of contract claims is due to be granted.  By

separate Order, the court shall **GRANT** said motion, finding no genuine issue of material fact and that defendant Conseco is entitled to judgment in its favor as a matter of law.  Judgment shall be entered accordingly.

     **DONE** and **ORDERED** this the 21st day of <u>January</u>, 2009.

_____

INGE PRYTZ JOHNSON

U.S. DISTRICT JUDGE
